UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MICHAEL **MELENDEZ**,

                        Plaintiff,

        V.

**CITY OF NEW YORK**; NEW YORK CITY
DEPARTMENT OF PROBATION; VINCINT N.
SCHIRALDI, COMMISSIONER; SHARUN
GOODWIN, ASSISTANT COMMISSIONER;
RALPH ABREU, BRANCH CHIEF; SHARON
DIXON, PROBATION OFFICER; EDITH RUBIN,
BRANCH CHIEF; HATTIE HEDGEPETH,
SUPERVISING PROBATION OFFICER; DONNA
M. DODDS, COUNSEL,

                        Defendants.
-------------------------------------------------------------------X

# 12 CV 9241

#2

Docket No. _____ -cv- _____

# COMPLAINT

**under the
Civil Rights Act
42 U.S.C.A. §1983**

**JURY TRIAL DEMANDED**

RECEIVED SDNY PRO SE OFFICE 2012 DEC 17 P 3: 42

## INTRODUCTION

    1. Plaintiff Michael Melendez, Proceeding pro se, for his complaint against the above named Defendants, alleges as follows:

## JURISDICTION AND VENUE

    2. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(3)&(4), and 2201. The matters in controversy arise under 42 U.S.C. § 1983. The Court has supplemental jurisdiction over Plaintiff's state law tort claims under 28 U.S.C § 1367.

    3. Venue properly lies in this Court, pursuant to 28 U.S.C. § 1392(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in the Counties of New York and the Bronx, which are within the judicial district of this Court.

## PARTIES IN THIS COMPLAINT

4. The Plaintiff, Michael Melendez, is currently serving an indeterminate term of imprisonment under the New York State Department of Corrections and Community Supervision ("DOCCS") at the Woodbourne Correctional Facility in the Town of Woodbourne, County of Sullivan, and State of New York. Plaintiff's prisoner identification number is 91-A-9649. Plaintiff is currently proceeding pro se.

5. The Defendant, City of New York, at the times of the acts and/or omissions complained of herein, was a municipality responsible for its practices, policies, and customs, and the training, supervision, monitoring, and discipline of its officers. Defendant City of New York is being sued in its official and individual capacities. The last known address of counsel for the City of New York is Michael A. Cardozo, Corporation Counsel, Law Department, 100 Church Street, New York, New York 10007.

6. The Defendant, New York City Department of Probation, ("DOP"), at the times of the acts and/or omissions complained of herein, was an agency of the City of New York and as such, was responsible for the training, supervision, monitoring, and discipline of its officers, and the duty to maintain accurate, fair, and reliable records. Defendant DOP is being sued in its official and individual capacities. The last known address for Defendant DOP is 33 Beaver Street, New York, New York 10004.

7. The Defendant, Vincint N. Schiraldi, at the times of the acts and/or omissions complained of herein, was the Commissioner for the DOP and as such, was responsible for the supervision, monitoring, and discipline of DOP's officers and the duty to maintain accurate, fair, and reliable records. Defendant Schiraldi is being sued in his official and individual capacities.

The last known address for Defendant Schiraldi is 33 Beaver Street, New York, New York 10004.

8. The Defendant, Sharun Goodwin, at the times of the acts and/or omissions complained of herein, was an Assistant Commissioner for the Bronx Branch of the DOP and as such, was responsible for the supervision, monitoring, and discipline of DOP's officers and the duty to maintain accurate, fair, and reliable records. Defendant Goodwin is being sued in his/her official and individual capacities. The last known address for Defendant Goodwin is 265 East 161st Street, Bronx, New York 10451.

9. The Defendant, Ralph Abreu, at the times of the acts and/or omissions complained of herein, was the Bronx Branch Chief for the DOP and as such, was responsible for the supervision, monitoring, and discipline of DOP's officers and the duty to maintain accurate, fair, and reliable records. Defendant Abreu is being sued in his official and individual capacities. The last known address for Defendant Abreu is 265 East 161st Street, Bronx, New York 10451.

10. The Defendant, Sharon H. Dixon, at the times of the acts and/or omissions complained of herein, was a probation officer for the DOP and as such, was responsible for the duty to conduct pre-sentence investigation reports and maintain records in an accurate, fair, and reliable manner. Defendant Dixon is being sued in her official and individual capacities. The last known address for Defendant Goodwin is 265 East 161st Street, Bronx, New York 10451.

11. The Defendant, Edith Rubin, at the times of the acts and/or omissions complained of herein, was the Bronx Branch Chief for the DOP and as such, was responsible for the supervision, monitoring, and discipline of DOP's officers and the duty to maintain accurate, fair, and reliable records. Defendant Rubin is being sued in her official and individual capacities. The last known address for Defendant Goodwin is 265 East 161st Street, Bronx, New York 10451.

3

12. The Defendant, Hattie Hedgepeth, at the times of the acts and/or omissions complained of herein, was the Bronx Branch Supervising Probation Officer for the DOP and as such, was responsible for the supervision, monitoring, and discipline of DOP's officers and the duty to maintain accurate, fair, and reliable records. Defendant Hedgepeth is being sued in her official and individual capacities. The last known address for Defendant Goodwin is 265 East 161st Street, Bronx, New York 10451.

13. The Defendant, Donna M. Dodds, at the times of the acts and/or omissions complained of herein, was counsel for the DOP and as such, was responsible for assuring that the DOP's officers perform their duties and maintain records in accordance with law. Defendant Dodds is being sued in her official and individual capacities. The last known address for Defendant Dodds is 215 East 161st Street, Bronx, New York 10451.

## STATEMENT OF CLAIMS

14. Plaintiff is currently serving a concurrent indeterminate term of imprisonment of 25-years-to-life and 7½ to 15 years for a conviction of second degree murder and second degree criminal possession of a weapon, *following a jury trial and verdict* before the Supreme Court of the State of New York, County of Bronx, on November 13, 1991.

15. During the trial that resulted in that conviction, it was undisputed, through the credible medical and ballistics evidence, that Mr. Diaz was shot in left leg and the chest; the latter initial bullet track was "backwards." *See*, Exhibit A, at *5. Since the medical and ballistics evidence infers that this was a face-to-face shooting incident, Angel and Ms. Ramos' description of the shooting incident is, therefore, unreliable because Mr. Diaz was not shot in the back. *See*, Exhibit A, at *3-*4. That leaves the people's case with the testimony of Ms. Johnson, who testified that Plaintiff was using the telephone for a few minutes when Mr. Diaz approached him.

Ms. Johnson described Mr. Diaz as angry and yelling at Plaintiff. Ms. Johnson saw Mr. Diaz shoving and yanking Plaintiff back and forth, when she then saw Plaintiff pull out a gun, although she did not see the actual shooting. *See*, Exhibit A, at \*2-\*3. Thus, Ms. Johnson's description of Mr. Diaz's aggression and assault upon Plaintiff is not only consistent with the undisputed medical evidence that Mr. Diaz was drunk. But, her testimony is the only reliable description of the present offense; a description that shows the shooting occurred in the midst of Mr. Diaz's assault upon Plaintiff.[1] Moreover, the evidence shows there were only two shots fired during the melee. *See*, Exhibit A, at \*5. It was also undisputed that Angel had taken Mr. Diaz to the hospital and, therefore, that Mr. Diaz's body was not present when the police arrived on the scene. *See*, Exhibit A, at \*3, \*5.

16.   Following the conviction, the DOP was directed to conduct a pre-sentence investigation report, for use at the sentencing of the Plaintiff, by the DOCCS, and by the Board of Parole in considering Plaintiff for release to parole supervision. The pre-sentence investigation report was required to be made and based upon accurate, fair, and reliable facts and information. The pre-sentence report prepared subject to Plaintiff's criminal conviction was prepared by Defendant Dixon, reviewed by Defendant Hedgepeth, and submitted by Defendant Rubin. *See*, Exhibit B.

17.   After conducting her alleged investigation, Defendant Dixon stated in the pre-sentence investigation report that Plaintiff's conviction resulted from a plea. Defendant Dixon then described the present offense as follows:

> "***Upon arriving at the scene, which is a grocery store, the officers observed*** *that the victim, Vinicio Diaz, had sustained gunshot wounds to his left chest area and his left leg*.  . . .   The police investigation revealed that prior to the shooting, the

---

[1] Significantly, Ms. Johnson's description of the incident, was not decisively at odds with the eyewitness testimony supporting Plaintiff's justification defense. *See*, Exhibit A, at \*6-\*8.

defendant was inside of the deceased's grocery store using the pay phone. *At some point the deceased approached Melendez, and requested that the defendant not use the phone for extensive periods of time. At this point, the defendant became agitated. . . . The defendant then started to walk toward the door when he turned around and stated to the deceased, "I don't give a fuck, I'll shoot you." The Defendant then proceeded to fire three shots at the deceased, striking Mr. Diaz twice. The other spent round was found near a counter in the grocery store."* (italics added).

*See*, Exhibit B.

18. As evident from a comparison review of the pre-sentence investigation report and the trial testimony, the pre-sentence investigation report's description of Plaintiff's conviction and present offense is contrary to and unsupported by the evidence at trial. Defendant Dixon conducted and prepared the subject pre-sentence investigation report that is based, therefore, upon an inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported description of Plaintiff's conviction and present offense. Defendant Dixon thereby failed to assure that the pre-sentence investigation report's description of Plaintiff's conviction and present offense was based upon accurate, fair, and reliable facts and information and therefore, that the pre-sentence investigation report would not violate Plaintiff's rights to be free from unlawful and unconstitutional deprivation of liberty.

19. When Defendant Hedgepeth reviewed the pre-sentence investigation report, Defendant Hedgepeth failed to assure that the pre-sentence investigation report's description of Plaintiff's conviction and present offense was based upon accurate, fair, and reliable facts and information and therefore, that the pre-sentence investigation report would not violate Plaintiff's rights to be free from unlawful and unconstitutional deprivation of liberty.

20. Prior to submitting the pre-sentence investigation report to the court, DOCCS,[2] and the Board of Parole, Defendant Rubin failed to assure that the pre-sentence investigation report's description of Plaintiff's conviction and present offense was based upon accurate, fair, and reliable facts and information, and therefore, that the pre-sentence investigation report would not violate Plaintiff's rights to be free from unlawful and unconstitutional deprivation of liberty.

21. On December 31, 2010, Plaintiff wrote separate letters to Defendants Schiraldi, Abreu, Goodwin, Hedgepeth, Dixon, and Rubin. Enclosed with each letter, Plaintiff submitted a legal memorandum, with true copies of the underlying pre-sentence investigation report and trial transcripts attached thereto. The underlying pre-sentence investigation report demonstrates that the description of Plaintiff's conviction and present offense is inaccurate, unfair, and unreliable, and therefore would prejudice Plaintiff's appearances before the Board of Parole. Plaintiff requested that Defendants correct the pre-sentence investigation report.

22. By letter dated January 20, 2011, Defendant Dodds responded on behalf of the Defendants. Defendant Dodds advised Plaintiff that the DOP is unable to amend the pre-sentence investigation report and that Plaintiff should seek judicial remedy from the sentencing court.

23. By separate letters dated January 28, 2011, Plaintiff wrote to Defendants Schiraldi, Abreu, Goodwin, Hedgepeth, Dixon, and Rubin requesting that Defendants add an addendum to the underlying pre-sentence investigation report with an accurate, fair, and reliable description of Plaintiff's conviction and present offense. Defendants Schiraldi, Abreu, Goodwin, Hedgepeth, Dixon, Rubin, and Doods failed to correct or amend the pre-sentence investigation report.

---

[2] In addition to the pre-sentence investigation report, DOCCS and Board of Parole records describing Plaintiff's conviction and present offense are based upon the inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported pre-sentence investigation report.

24. When Plaintiff appeared for parole release consideration on December 6, 2011, the Board of Parole, who was legally bound to accept pre-sentence investigation reports as reliable, had no option but to consider as an aggravating factor, the inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported pre-sentence investigation report. That is, consideration of a description of Plaintiff's conviction and present offense, which depicts Plaintiff as pleading guilty to firing several shots at Mr. Diaz for no reason at all. Meanwhile, the Board of Parole was prevented from acting in accordance with the due process and equal protection clauses requiring consideration of the trial evidence. That is, a mitigating factor evident from the trial evidence, which shows that Mr. Diaz, who was drunk, the initial aggressor, and much bigger and older than Plaintiff, at the very least, was shot during his physical assault upon Plaintiff - an assault that caused the fatal shot to Mr. Diaz's chest and therefore, shows a lack of intent to senselessly murder Mr. Diaz.  Thus, Plaintiff was denied release to parole supervision based upon the Board of Parole's consideration of the inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported description of Plaintiff's conviction and present offense, and thereby, Plaintiff was denied of his right to be free from unlawful and unconstitutional deprivation of liberty.

25. The manner by which Defendants Schiraldi, Abreu, Goodwin, Hedgepeth, Dixon, and Rubin conducted, prepared, reviewed, submitted, and/or refused to correct the inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported pre-sentence investigation report, stems from written and/or unwritten practices, policies and customs under which the Defendants acted with negligence and deliberate indifference to the rights of Plaintiff to be free from unlawful and unconstitutional deprivation of liberty.

8

26. The Defendant City of New York and its officers are and were aware, or should have been aware, through, including but not limited to, administrative and judicial challenges by Plaintiff and other similarly situated individuals, that:

a) the DOP and its officers would be called upon to conduct and prepare pre-sentence investigation reports;

b) the pre-sentence investigation reports must be prepared and based upon accurate, fair, and reliable information;

c) the DOP and its officers work closely with the City of New York's Offices of the District Attorneys when conducting and preparing pre-sentence investigation reports;

d) the close relationship between the DOP and its officers with the Offices of the District Attorneys calls for close scrutiny of pre-sentence investigation reports;

e) the Offices of the District Attorneys do not challenge pre-sentence investigation reports that are based upon inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported information;

f) there were many instances in which the DOP and its officers conducted and prepared inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported pre-sentence investigation reports;

g) court appointed attorneys regularly do not challenge inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported pre-sentence investigation reports prior to sentencing of defendants;

h) the failure of court appointed attorneys to challenge inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported pre-sentence investigation reports constitutes a waiver barring review under N.Y. Penal Law;

i) the court attorneys' failures to challenge inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported pre-sentence investigation reports does not amount to, and therefore are unchallengeable under, claims of ineffective assistance of counsel;

j) individuals subjected to unchallenged pre-sentence investigation reports that are based upon inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported information have no remedial recourse under N.Y. Penal Law;

k) the DOCCS and Board of Parole are bound by, and will subject individuals to pre-sentence investigation reports without regard as to whether the pre-sentence investigation reports are based upon inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported information;

l) the inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported pre-sentence investigation reports would violate, or have violated, an individual's constitutional rights to be free from unlawful and unconstitutional deprivation of liberty.

27. The Defendant City of New York and its officers have directly caused Plaintiff's constitutional rights to be violated by knowingly creating and maintaining a practice, policy and custom through which its officers conduct, prepare, review, submit, maintain, and/or refuse to correct pre-sentence investigation reports that contain inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported information.

28. The Defendant City of New York and its officers have directly caused Plaintiff's constitutional rights to be violated by knowingly being negligent and/or deliberate indifferent to the rights of Citizens to be free from unlawful and unconstitutional deprivation of liberty, in creating and maintaining a practice, policy and custom of failing to train, supervise, monitor, and discipline its officers' conduct and practice of conducting, preparing, reviewing, submitting, maintaining, and/or refusing to correct pre-sentence investigation reports that contain inaccurate, unfair, unreliable, unlawful, unconstitutional, prejudicial, and factually false and unsupported information.

29. The Defendant City of New York and its officers have directly caused Plaintiff's constitutional rights to be violated by being negligent and/or deliberate indifferent to Plaintiff's rights to be free from unlawful and unconstitutional deprivation of liberty, by creating and/or maintaining a practice, policy, and custom of failing to properly train, supervise, monitor, and discipline its officers, who conducted, prepared, reviewed, submitted, maintained and failed to

correct the pre-sentence investigation report created on Plaintiff, which contains inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported information that, despite Plaintiff's objections, remained as such at the time Plaintiff was considered for and denied release to parole supervision on December 6, 2011.

30. The Defendant City of New York and its officers' will continue to directly cause Plaintiff's constitutional rights to be violated by being negligent and/or deliberate indifferent to the rights of Citizens to be free from unlawful and unconstitutional deprivation of liberty, in maintaining and failing to correct pre-sentence reports that contain inaccurate, unfair, unreliable, unlawful, unconstitutional, prejudicial, and factually false and unsupported information that, despite objections, will remain as such when individuals reappear for reconsideration for parole.

31. The Defendant City of New York and its officers' will continue to directly cause Plaintiff's constitutional rights to be violated by being negligent and/or deliberate indifferent to the rights of Plaintiff to be free from unlawful and unconstitutional deprivation of liberty, by maintaining and failing to correct the pre-sentence report created on Plaintiff, which contains inaccurate, unfair, unreliable, unconstitutionally prejudicial, and factually false and unsupported information that, despite Plaintiff's objections, will remain as such in December 2013, or any time before or after that date, when Plaintiff reappears for reconsideration for parole.

## CAUSES OF ACTION

32. Plaintiff alleges that Defendants Schiraldi, Abreu, Goodwin, Dixon, Hedgepeth, Rubin, and DOP violated Plaintiff's constitutional rights, as set forth in paragraphs 15 through 31, above.

33. Plaintiff alleges that Defendant City of New York and its officers violated Plaintiff's constitutional rights, as set forth in paragraphs 15 through 31, above.

## PARYER FOR RELIEF

Wherefore, Plaintiff requests that the Court grant the following relief:

1). **Declaratory relief** declaring that the facts stated in the pre-sentence investigation report prepared pursuant to Plaintiff's criminal conviction contains inaccurate, unfair, unreliable, unconstitutional, prejudicial, and factually false and unsupported information; and that the Defendants have acted and/or failed to act in violation of Plaintiff's Constitution rights, as set forth in the Complaint herein.

2). **Injunctive relief** directing Defendants to correct, and declare null and void, the pre-sentence report prepared pursuant to Plaintiff's criminal conviction; to advise the DOCCS and the Board of Parole that the pre-sentence investigation report is null and void; and to provide DOCCS and the Board of Parole with a pre-sentence investigation report that is based upon the evidence under which Plaintiff was convicted at trial.

3). **Compensatory relief** awarding to Plaintiff payment in an amount the Court deems just and proper.

4). **Punitive Relief** awarding damages to Plaintiff payment in an amount the Court deems just and proper.

5). Granting such other and further relief as the Court may deem Plaintiff is entitled to.


I declare under penalty of perjury that the foregoing is true and correct and that this civil rights Complaint was placed in the prison mailing system on the 7th day of December 2012.

Executed on December 7, 2012

Michael Melendez, ID# 91-A-9649
Plaintiff, Pro Se
Woodbourne Correctional Facility
99 Prison Road, Box 1000
Woodbourne, New York 12788

## **<u>Memorandum of Trial Evidence</u>**

## **<u>EXHIBIT A</u>**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                  Plaintiff,

                                                        Indictment No. 8515/89

        v.

MICHAEL MELENDEZ,

                  Defendant.

-------------------------------------------------------------------X

## MEMORANDUM OF TRIAL EVIDENCE

       Defendant was convicted, following a jury trial and verdict before the Supreme Court of

the State of New York, County of Bronx, on November 13, 1991, of murder in the second degree

and criminal possession of a weapon in the second degree. On December 12, 1991, Defendant

was sentenced to a concurrent indeterminate sentence of 25-years-to-life for the murder count

and 7½ to 15 years for the weapon count. (Verdict: Tr. 215,389-390).[1]

       In this case, the People charged Defendant with intentionally murdering Venezio Diaz,

("Mr. Diaz"). Defendant raised a justification defense, pursuant to N.Y. Penal Law § 35.00, and

therefore, did not deny the shooting. It was undisputed during trial that on October 16, 1989, at

approximately 10:15 p.m., Defendant was speaking to a friend, from whom Defendant obtained a

gun. At approximately 10:30 p.m., Defendant went to the Diaz Family grocery store where he

used one of two public telephones located on the right side entrance of the store. Defendant made

and received a long distance call to Ms. Reyes in New Jersey. At some point, Mr. Diaz, who was

---

[1] Numbers in brackets preceded by "Tr." refers to pages of the trial court transcripts, maintained
in the Bronx County Clerk's Office, where the facts referred to can be found. The name, i.e.,
"Johnson," preceding Tr. and transcript page numbers, refers to the particular witness' testimony
or trial proceeding.

behind the counter, approached the telephone area.[2] Eyewitness testimony conflicted as to what occurred between Mr. Diaz's approach and the shooting.

## THE PEOPLE'S CASE

During the trial in the case, the People presented three eyewitnesses to the shooting incident: Stephanie Johnson, Angel Diaz, and Margie Ramos. Ms. Johnson testified that she had been using one of the two public telephones in the store for about 15-20 minutes when she was approached by Mr. Diaz, who was angry, yelling, and told Ms. Johnson to hang up the telephone because she was not putting any money into the telephone and that he would hang up the telephone if she did not hang up. Ms. Johnson hung up the telephone and stood in front of the store when she saw Defendant enter the store and use the telephone. (Johnson: Tr. 129-131,136-138,142,144,166-167). A few minutes later, Ms. Johnson saw Mr. Diaz angrily yelling and "fussing" with Defendant. She heard Mr. Diaz say that Defendant had been on the telephone for to long and had not been putting any money into the telephone. Ms. Johnson saw Mr. Diaz snatch the telephone receiver from Defendant and heard Mr. Diaz say, "I don't want you all being on the phone." She then saw Mr. Diaz shoving Defendant and what appeared to be a back and forth shoving. Ms. Johnson claimed that during the shoving, she heard Plaintiff say, three times, "I don't give a fuck, I'll shoot you." (Johnson: Tr. 130-132,142,146-149,152,154-155). Ms. Johnson then saw Mr. Diaz grab Defendant by the wrist and violently yanking Defendant back and forth. During this encounter, Ms. Johnson saw Defendant pull out a gun. She was unsure of the number of shots she heard, but she did not see the shooting because her view was

---

[2] While Angel and Felix Diaz, (brothers of Mr. Diaz), and Victor Marte, (cousin of Mr. Diaz), claimed that Defendant used the telephone for 25-30 minutes, Stephanie Johnson indicated it was 10 minutes and defense witnesses stated it was less. Defendant did not prevent anyone from using the other telephone. (Defendant: Tr. 156; Herbert: Tr. 111-113; Maritza: Tr. 132; Reyes: Tr. 79-84; Perez: Tr. 85-87; Johnson: Tr. 142; A. Diaz: Tr. 11; F. Diaz: Tr. 111; Marte: Tr. 80).

partially obstructed by Defendant, who stood between her and Mr. Diaz. (Johnson: Tr. 132-133,152,154-157,163-166). Ms. Johnson also testified that she did not see anyone standing next to Mr. Diaz during the incident. (Johnson: Tr. 148,157,167,170).

Angel Diaz, (hereinafter, "Angel"), testified that Mr. Diaz approached the telephone area and asked Defendant and Ms. Johnson to allow other people to use the telephones. Contrary to Ms. Johnson's testimony, Angel claimed that Mr. Diaz did not argue with Ms. Johnson, who just hung up and left the store, while an argument occurred between Mr. Diaz and Defendant, who remained on the telephone. (A. Diaz: Tr. 2,11-12,36,46). Angel claimed Mr. Diaz told Defendant to let other people use the telephone, and that Defendant stated it was a public phone. According to Angel, Defendant was angry, but Mr. Diaz was not. Angel claimed that Mr. Diaz snatched the telephone receiver from Defendant and that Mr. Diaz did not touch Defendant, but simply asked Defendant to leave the store. According to Angel, Defendant snatched the telephone receiver from Mr. Diaz, who then told Defendant that he would throw Defendant out of the store. Mr. Diaz then snatched the telephone again, and Defendant responded stating, "if you throw me out, I'll shoot you." (A. Diaz: Tr. 12,15-16,46-49,52-55). At some inconclusive point of Angel's incoherent description of the incident, Angel claims, contrary to the medical and ballistics evidence, that *Defendant* **pulled out a gun and as he was backing away**, **shot Mr. Diaz in the back.** Although Angel claimed he was standing beside Mr. Diaz when the shooting occurred, he later testified that he was behind the counter during the shooting. (A. Diaz: Tr. 15-16,54-56,65). **Angel claims he placed Mr. Diaz in a car and took Mr. Diaz to the hospital.** Angel denied chasing Defendant after the shooting. (A. Diaz: Tr. 17,40-41). Although Angel denied being arrested during his testimony before the Grand Jury, at trial he admitted to being arrested and convicted in 1974 of illegal possession of a gun he possessed in the store. Angel claimed he was

3

later given a license and that everyone in the store had guns. (A. Diaz: Tr. 177-179,190-192,194-195,210).

Margie Ramos (a friend of Angel) alleged she saw the entire incident from her fourth floor window, located across the two-way street from the store. Ms. Ramos claimed that she saw a young man on the telephone and heard Mr. Diaz tell the young man to hang up the telephone because Mr. Diaz was closing the store. (Ramos: Tr. 177-179,190-192,194-195,210). She testified that she did not see Mr. Diaz snatch the telephone receiver from the young man and that she did not know how long the young man was on the telephone. According to Ms. Ramos, the young man responded saying, "no," that he was using the phone, "to wait." Ms. Ramos claimed there was no noise in the street and she could hear Mr. Diaz and the young man arguing loudly, although Mr. Diaz was not angry. She claims that she heard Mr. Diaz say, "please hang up" because Mr. Diaz was going to close the store. At this time, Ms. Ramos claims, she saw the young man drop the telephone receiver and punch Mr. Diaz with a closed fist, but she could not say with what hand. Mr. Diaz then fell to the ground, stood up, and turned his back to the young man and then pushed the young man out of the store. (Ramos: Tr. 179-181,196-197,199-200). Later she claimed that when Mr. Diaz stood up, he asked the young man to leave in a normal voice. (Ramos: Tr. 202-203). At some inconclusive point in her peculiar description of the incident, Ms. Ramos claims, Mr. Diaz turned his back to the young man, pushed the young man, and then walked three feet into the store when the young man *shot Mr. Diaz in the back*. (Ramos: Tr. 177,181,206-210). According to Ms. Ramos, there were no other people near Mr. Diaz and the young man or on the sidewalk in front of the store during the entire incident. Ms. Ramos claimed she had been going to the store for four years and that there was only one telephone in the store. (Ramos: Tr. 183,190-191,194,201-202,208-210).

The People also called Arnold Rossine, a detective from the New York City Police Department's Crime Scene Unit, who conducted a ballistics investigation of the scene and found no evidence of any other gunshots in the direction of the shooting. He found a deformed bullet on the floor in the store; *a bullet that could have been the bullet that went through Mr. Diaz's left leg. Detective Rossine testified that Mr. Diaz also sustained a bullet wound to his chest*. (Det. Rossine: Tr. 4-5,8-10,16-17).

The People called John Pearl, a Medical Examiner for the City of New York, who performed an autopsy on Mr. Diaz and testified as an expert. Dr. Pearl testified that Mr. Diaz sustained a bullet wound that entered and exited the left leg and *a fatal bullet wound to the left region of his chest*; the latter bullet wound traveled *"backwards,* downwards and [then] towards the right" within Mr. Diaz's body. (Dr. Pearl: Tr. 5-8,11). Dr. Pearl also testified that at the time of death, Mr. Diaz had an alcohol content of .07% in his blood and .06% in his brain. (Dr. Pearl: Tr. 9-10).

Albert Riccio, a Police Officer from the New York City Police Department, was the first officer to respond to the scene. Officer Riccio testified that when he arrived on the scene, Mr. Diaz's body was not present. Officer Riccio learned that Mr. Diaz had been taken to the hospital. (P.O. Riccio: Tr. 20-21)

Although the trial evidence herein is stated in light most favorable to the People's case, the evidence in support of Defendant's justification defense was not inconsistent with the credible testimony from Ms. Johnson, Detective Rossine, and Dr. Pearl.

## THE DEFENSE'S CASE

Defendant testified that while waiting to use the telephone, he observed Mr. Diaz in a physical confrontation with a female patron. Defendant then made a long distance call to Ms. Reyes, during which the operator indicated that he had but a few seconds left on the call. Defendant, who did not have anymore change, gave Ms. Reyes the telephone number and asked her to call him back. While waiting for Ms. Reyes to return the call, Defendant saw Mr. Diaz arguing with and shoving a second female patron. (Defendant: Tr. 150,155-156,163). When Ms. Reyes returned the call and Defendant picked up the telephone, Mr. Diaz turned to Defendant and belligerently told Defendant to get the fuck off the telephone. When Defendant attempted to inquire, Mr. Diaz mushed Defendant's face several times and then snatched the telephone receiver from Defendant. (Defendant: Tr. 157-158). Mr. Diaz then shoved and grabbed Defendant by the neck and shirt collar. Holding onto Defendant, Mr. Diaz began to violently shove Defendant back and forth. During this encounter, Defendant saw Mr. Diaz reach towards his waist where Defendant saw a bulge. Believing the bulge was a gun, Defendant pulled out a gun and fired down towards Mr. Diaz, who then shoved Defendant; causing Defendant's arms to involuntarily rise up in a windmill fashion as Defendant stumbled backwards. (Defendant: Tr. 152,162-163). Following the shooting, Defendant was chased by Angel Diaz, who possessed a gun. Defendant also admitted that he possessed the gun illegally and that he had previously been convicted of two felonies. (Defendant: Tr. 152,162-163).

The defense called Rosa Herbert, ("Ms. Herbert"), an eyewitness, who testified that she was standing directly in front of the store during the incident and five feet behind Defendant when the shooting occurred. (Herbert: Tr. 103-105,108-109,112). Ms. Herbert testified that she saw Defendant enter the store. For approximately 3 to 5 minutes, Defendant used the telephone,

hung it upon, and picked up the telephone when it rang. (Herbert: Tr. 106,110-112). At this time, Ms. Herbert saw Mr. Diaz approach Defendant and heard Mr. Diaz tell Defendant that he did not want anyone beeping from his telephones. Ms. Herbert then saw Mr. Diaz snatch the telephone receiver from Defendant and saw Mr. Diaz shoving Defendant. She heard Defendant ask Mr. Diaz to calm down and not push him. (Herbert: Tr. 111-112,120,126). Ms. Herbert heard Mr. Diaz tell Defendant that if he did not like it, to get the fuck out of the store. Ms. Herbert then saw Mr. Diaz's arm reach for his waist and saw Defendant step back, pull out a gun, and fire two shots. Ms. Herbert saw Angel Diaz with a gun as he chased after Defendant. (Herbert: Tr. 113-116,120-121).

The defense also called Maritza Melendez ("Maritza"), unrelated to Defendant. She was standing directly in front of the store during the incident. (Maritza: Tr. 127-128,131). Maritza testified that she saw Defendant enter the store and begin using the telephone. About two minutes later, she saw Mr. Diaz approach Defendant. Mr. Diaz said something, which Maritza could not make out. Maritza saw Mr. Diaz push Defendant twice. She then saw Mr. Diaz grabbing Defendant by the shirt collar, and Defendant attempting to get Mr. Diaz's hands away. (Maritza: Tr. 131-133). Maritza then saw Defendant fire one shot at Mr. Diaz, while Defendant and Mr. Diaz were facing each other. Maritza could not see whether Mr. Diaz had reached for his waist prior to the shooting because her view was partially obstructed by Defendant, who stood between her and Mr. Diaz. (Maritza: Tr. 133,145-146). Maritza further testified that there was no other person near Mr. Diaz and Defendant during the incident. Maritza also saw Angel Diaz with a gun in his hand as he chased Defendant. (Maritza: Tr. 134-137,147).

## **VERIFICATION**

STATE OF NEW YORK)
                                   )ss.:
COUNTY OF SULLIVAN)

    Michael Melendez, being duly sworn, deposes and says: 1) that I am the Defendant in the

above-captioned matter and as such, I am fully familiar with the facts and circumstances herein;

2) that I am over 18 years of age; and 3) that the facts set forth in the above Memorandum of

Trial Evidence is based upon the testimony contained in the transcript, as kept in the Office of

the Bronx County Clerk, in the above-captioned case and indictment.

Dated: November 30, 2012

      **DOROTHY DAVIS**
      Notary Public, State of New York
      No. 01DA6215127
      Qualified in Sullivan County
      Commission Expires December 21, 2013


SWORN     TO     BEFORE     ME

THIS 7Th DAY OF Dec , 20 12

_____
      NOTARY PUBLIC

_____
Michael Melendez
ID# 91-A-9649
Woodbourne Correctional Facility
99 Prison Road, Box 1000
Woodbourne, New York 12788

# Pre-Sentence Investigation Report

# EXHIBIT B

# NEW YORK CITY DEPARTMENT OF PROBATION

| COURT | COUNTY |
|---|---|
| Supreme | Bronx |

| | PROBATION OFFICER |
|---|---|
| | Sharon H. Dixon |

REPORT: PRE-SENTENCE ☒  PRO FORMA ☐  PRE-PLEADING ☐

PROBATION CASE #

| DOCKET / INDICTMENT # (S) | DATE(S) FILED | COURT CONTROL # (S) | |
|---|---|---|---|
| 8515/89 | 10-30-89 | 1263446Q | XS9108187 |
| | | | NYSID # 5611983N |
| | | | F.B.I. # 849660EA3 |

| LAST NAME | FIRST | MIDDLE | DATE OF BIRTH | CITIZEN OF |
|---|---|---|---|---|
| RE: A.K.A. Melendez, | Michael | | 6-24-67 | U.S.A. |

PLACE OF BIRTH
New York City

RESIDENCE: 345 Cypress Avenue, Apt. #2E, Bronx, N.Y. 10454          (No Phone)

| LIVES WITH | MARITAL STATUS | HEIGHT | WEIGHT | SEX | RACE | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| Mother | Single | 5'8" | 150 | M | Hispanic | Unknown |

STATUS

CO-DEFENDANTS / ACCOMPLICES

| DATE(S) OF OFFENSE | DATE(S) OF ARREST | DATE(S) OF CONVICTION/ARREST | |
|---|---|---|---|
| 10-16-89 | 10-19-89 | 11-13-91 | LIBERTY ☐  CUSTODY ☒ |
| | | | PLEA ☒   TRIAL ☐ |

| FINAL CHARGE / CONVICTED OF: (Use Nomenclature) | DOCKET / INFORMATION / INDICTMENT CHARGES |
|---|---|
| Murder-2° C.P.W.-2° | Murder-2° C.P.W.-2° C.P.W.-3° |

### CONVICTION CHARGE CODE [CVC]

| LAW | SECTION | SUBDIV | CL | OF | ATT | DEC |
|---|---|---|---|---|---|---|
| P L | 1 2 5 2 5 | | A1 | F | 0 | 2° |

COVERED CHARGES

| OTHER PENDING CHARGES?   YES ☐   NO ☒ | DRUGS: | EXAM DATE | CERTIFIED ADDICT ☐  NON-ADDICT ☐ |
|---|---|---|---|
| YOUTHFUL OFFENDER: REQUIRED YES ☐ NO ☐  ELIGIBLE YES ☐ NO ☒ | CERTIFICATE OF RELIEF FROM DISABILITIES: | | ELIGIBLE YES ☐ NO ☐ |
| JUDGE Globerman | PART 37 | DATE(S) OF SENTENCE / PLEADING HEARING 12-6-91 | |
| A.D.A. Allen Karen | COUNSEL AND ADDRESS Jeffrey Pogrow, 705 Bronx River Rd., Yonkers, N.Y. 10704 | | |

DISPOSITION

"Privileged and Confidential"

1809/1  0335P

Melendez, Michael                                                    XS9108187

-2-

Attached hereto is the pre-sentence investigation report submitted by this
Department prior to the defendant's sentence in Bronx Supreme Court on
July 14, 1987 to concurrent terms of 2 to 6 years incarceration.   This
report covers his prior socio-legal history.

ADDITIONAL COURT RECORD

Mar.-9-86        C.P.W.-4°                Bronx Criminal Court          Purged Case

Pending Charges

None

Present Offense

The following account is based upon information obtained from the court papers,
and the district attorney's file.

Complainant:

Detective el's terused to 40th Precinct, Bronx.

Deceased:

        Vinicio Diaz

On October 16, 1989 at approximately 11:00 p.m., at 217 St. Ann's Avenue,
Bronx, police responded to a radio run of "man shot."  Upon arriving at
the scene, which is a grocery store, the officers observed that the victim,
Vinicio Diaz, had sustained gun shot wounds to his left chest area and his
left leg.  No weapon was recovered, and no arrest was made at this time.

Mr. Diaz was transported to Lincoln Hospital, where he was pronounced dead
on October 16, 1989 at 11:32 p.m.

The case was assigned to Detective mes o of the 40th precinct.  Pursuant to a
police investigation, Michael Melendez become a suspect.  An eyewitness
described him as the perpetrator, and he was apprehended on October 19, 1989
at 593 East 141st Street, Bronx.

Melendez, Michael                                                        XS9108187

-3-

The police investigation revealed that prior to the shooting, the defendant
was inside of the deceased's grocery store using the pay phone.  At some point
the decease approached Melendez, and requested that the defendant not use the
phone for extensive periods of time.  At this point, the defendant became
agitated.

The defendant then started to walk toward the door when he turned around and
stated to the deceased, "I don't give a fuck.  I'll shoot you."  The defendant
then proceeded to fire three shots at the deceased, striking Mr. Diaz twice.
The other spent round was found near a counter in the grocery store.

Michael Melendez, arrested on October 19, 1989, remains in custody pending sentence
in the instant offense.

Summary of Offender's Statement:

The defendant     refused to be interviewed on three prior occasions, stating
in each instance that he was scheduled to be produced in the Supreme Court Pens,
that he had a visitor.  Thus, his statement concerning the crime could not be
obtained.

Statement of Next of Kin:

,                      cound not be contacted for an interview.  According to her
                                 was recently hospitalized with a severe asthma
condition, and at this time she is unable to communicate for long periods of
time.

The deceased's terused to be inter, gave the following statements.  He asserts
that his.im could Vinicio, age 33, was a devoted husband and father, who was well
respected in the neighborhood.  The deceased survivors include his wife,
, and their three children,
        He reports that due to the defendant's actions herein, he and family
have suffered a tremendous loss, as an individual as special as _____ can
never be replaced.

As to sentencing, he feels that in light of the defendant's history of violent
behavior, he should receive the maximum sentence under the law.

Analysis of Offense and Legal History:

This 23 year old defendant's adult legal history began in 1986, and his record
primarily consists of arrest for crimes of violence.  Additionally, he has an
extensive Bronx Family Court history which resulted in numerous sentences of
probation, and a 12 month placement in a Division for Youth facility.

Melendez, Michael                                                    XS9108187

-4-

On January 14, 1987 following his conviction for Criminal Possession of a
Weapon-2° and Attempted Robbery-1 , he was sentenced in Bronx Supreme Court
to concurrent terms of 2 to 6 years.       Released to state parole on
August 8, 1989, the instant crime represents his only subsequent rearrest.
His conviction herein constitutes a violation of the condition of his release.

Apparently he derived no benefits from his prior incarceration experience, or
parole supervision, as evidenced by his actions in the instant crime.  Herein,
the defendant fatally shot Vinicio Diaz, following a brief disagreement with
the deceased over a pay phone in his grocery store.

The autopsy report gave the cause of death of Vinicio Diaz, as "penetration of
lung and spine due to gunshot wound to chest and leg.  Homicide."

In light of the defendant's extensive history of violent criminal behavior,
he has revealed himself to be a dangerous individual who poses a serious
risk to the community.  His behavior shows that the defendant has no regard
for human life, and the instant murder was a senseless, cold-blooded criminal
act.  He now faces sentencing as a second violent felony offender.


                         ADDITIONAL SOCIAL HISTORY



Refer to that attached pre-sentence report of January 14, 1987 for the defen-
dant's previous social history.

The defendant refused to be interviewed; thus, additional social history re-
garding him could not be obtained.


                              Attested by:_____
                                           Sharon H. Dixon
                                           Probation Officer



Reviewed by: _Hattie Hedgepeth_ Submitted by: _____
              Hattie Hedgepeth                 Edith Rubin
              Supv. Probation Officer          Branch Chief

SHD:ch
12/5/91



WOODBOURNE

US POSTAGE
Mailed From 12788
12/12/2012

Michael Melendez
ID# 91-A-9649
Woodbourne Correctional Facility
99 Prison Road, Box 1000
Woodbourne, New York 12788

Ruby J. Krajick, Clerk
Office of the Pro Se Clerk
United States District Court
Southern District of New York
U.S. Courthouse
500 Pearl Street
New York, New York 10007

USM PS
SDNY

RECEIVED
DEC 17 2012
PRO SE OFFICE